IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH WIGHTMAN and DONALD ROWE, </br></br> Plaintiffs, </br></br> v. </br></br> WAUCONDA TOWNSHIP HIGHWAY DEPARTMENT, SCOTT WEISBRUCH, individually and in his official capacity as WAUCONDA TOWNSHIP HIGHWAY COMMISSIONER, and GLENN SWANSON, individually, </br></br> Defendants. | No. 19-CV-2344 </br></br> Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Joseph Wightman and Donald Rowe have sued their former employer, the Wauconda Township Highway Department (the "Highway Department"), Scott Weisbruch, and Glenn Swanson for retaliation under the First and Fourteenth Amendments as well as tortious interference with employment and prospective economic advantage. Wightman and Rowe allege that Weisbruch fired them, at Swanson's insistence, for supporting Weisbruch's rival candidate for Highway Commissioner. The defendants have moved to dismiss the complaint. For the reasons discussed below, their motion to dismiss is denied.

### BACKGROUND[1]

Plaintiffs Joseph Wightman and Donald Rowe were employed as highway maintenance workers for the Highway Department when their employment was terminated in May 2017.

---

[1] For the purposes of this motion, the court accepts all of the plaintiffs' factual allegations as true and draws all reasonable inferences in their favor.

Compl. ¶¶ 13, 14, ECF No. 1. Wightman began working at the Highway Department in November 2008, while Rowe started in January 2014. *Id.* As highway maintenance employees, Wightman and Rowe performed tasks including plowing, grading and resurfacing designated roadways within the district, excavating and mowing adjacent ditches, maintaining and repairing roadway signage and barriers, and maintaining the Department's equipment and vehicles. *Id.* ¶ 30. None of their duties involved policy-making or advising the Highway Commissioner on policy decisions. *Id.* ¶¶ 32-33. Wightman and Rowe's supervisor was Joe Munson, the Township Highway Commissioner. *Id.* ¶ 35.

Prior to 2016, Munson found himself at odds with Defendant Glenn Swanson, Wauconda's Township Supervisor, over prioritizing certain roadway improvements and best practices for snow removal. *Id.* ¶ 36. In his role, Swanson serves as Wauconda's Chief Law Enforcement Officer and policymaker, which includes allocating finances to the Highway Department. *Id.* ¶ 25. Notably, Swanson does not have supervisory authority over Highway Department staff or the authority to triage highway projects. *Id.* ¶ 37. Under the Illinois Highway Code, it is the Highway Commissioner who retains sole authority to "employ labor" for the Highway Department. *Id.* ¶ 11. Even so, Swanson attempted to direct Highway Department staff to work on certain projects, but Munson informed his staff, including Wightman and Rowe, to disregard Swanson's directives. *Id.* ¶¶ 38, 39. At loggerheads with Munson, Swanson decided to recruit a new candidate to run for Highway Commissioner who would agree with his vision. *Id.* ¶ 40.

In 2016, Swanson recruited and backed Scott Weisbruch for the role. In the run-up to the April 2017 election, Swanson provided Weisbruch with campaign resources and formed the Wauconda Township for the People Political Action Committee, which promoted Weisbruch's candidacy. *Id.* ¶¶ 41-43. Swanson and Weisbruch agreed that Weisbruch would fire Wightman and

Rowe after taking office, in exchange for Swanson's financial and political support. *Id.* ¶¶ 115-16. Munson decided not to run for re-election, but endorsed his brother, James Munson, for the position. *Id.* ¶ 44. Both Wightman and Rowe avidly supported James Munson's campaign. *Id.* ¶¶ 46, 51. Wightman campaigned for Munson, appearing with him at three public events, including one at the Township Hall, speaking with more than 20 residents on his behalf, and posting his campaign signs around town. *Id.* ¶¶ 47-49. Rowe also appeared with Munson at public events, including at the Township Hall, spoke with more than 15 residents on his behalf, and promoted his candidacy with members of his Mason Lodge. *Id.* ¶¶ 52-54.

On April 4, 2017, Weisbruch won the election against Munson and was set to assume office on May 15, 2017. *Id.* ¶¶ 56, 57. In the interim, on April 7, Swanson visited the Highway Commissioner's building with one of Munson's election signs in tow. *Id.* ¶¶ 59, 60. Swanson told Wightman and Rowe that he believed they had posted the sign and that he wanted to return it to them. *Id.* ¶ 60. He then attempted to fire the two employees, telling them, "You're fired. Get your shit and get out of here." *Id.* ¶ 61. When Rowe replied that Munson was still his boss and Swanson did not have the authority to fire them, Swanson angrily told them that he was aware they'd supported James Munson in the election and that they should start looking for new jobs. *Id.* ¶¶ 65, 66. Swanson yelled at Wightman and Rowe: "If you two had any brains, you'd get out of here now. Once my guy gets in, you'll be fired so fast your head will spin." *Id.* ¶ 67.

As Swanson promised, Weisbruch quickly terminated Wightman and Rowe on May 26, 2017, shortly after he had assumed office. *Id.* ¶ 68. He hired replacements for Wightman and Rowe, including Dennis Piehl, a previous supporter and colleague. *Id.* ¶ 69. Wightman and Rowe filed this suit on April 6, 2019.

**DISCUSSION**

The facts of the complaint present two claims: Weisbruch's termination of Wightman and Rowe in retaliation for supporting his rival candidate and Swanson's insistence that Weisbruch fire them for supporting Munson. The plaintiffs bring four theories of liability in support of these claims: (1) First Amendment retaliation against all defendants; (2) political affiliation-based discrimination in violation of the Fourteenth Amendment against all defendants; (3) tortious interference with employment against Swanson; and (4) tortious interference with prospective economic advantage against Swanson. The Court addresses the claims against the defendants in turn.

I. **Weisbruch and the Highway Department**

Wightman and Rowe bring a claim against Weisbruch, individually and in his official capacity, and the Highway Department for firing them based on their political affiliation with Munson, in violation of their First and Fourteenth Amendment rights under § 1983.[2]

A. **Legislative Immunity**

As a threshold matter, Weisbruch and the Highway Department argue they are entitled to legislative immunity from this suit because terminating Wightman and Rowe was a legislative action. Legislative immunity shields local government officials in their legislative actions. *Rateree v. Rockett*, 852 F. 2d 946, 950 (7th Cir. 1988). To determine whether an act is legislative, courts

---

[2] It should be noted that the Highway Department can be held liable as a municipality because (as alleged in the complaint) it is a separate entity from the township. Compl. ¶ 10; *see Reese v. Chicago Police Dep't*, 602 F. Supp. 441, 443 (N.D. Ill. 1984) (a department must have a "separate legal existence" to be a suable entity). Further, Weisbruch is a final decision-maker for the Department, meaning he has authority to establish policy regarding personnel decisions. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("Municipal liability attaches where the decision-maker possesses final authority to establish municipal policy with respect to the action ordered.")

look at "the function the individual performs," rather than the governmental position he occupies. *Id.* at 951. Legislative immunity is not unlimited, however; it applies only to actions conducted "in the sphere of legitimate legislative activity." *Bagley v. Blagojevich*, 646 F.3d 378, 391 (7th Cir. 2011).

The defendants contend Wightman's and Rowe's terminations fall in the legislative sphere because they were terminated pursuant to a reorganization of the Highway Department. This argument is a non-starter. This is a motion to dismiss and the defendants (and the Court) must accept the plaintiffs' allegations of fact as true for purposes of the motion. Wightman and Rowe have not alleged that they were fired because Weisbruch eliminated their roles, but rather in retaliation for their political activities; the complaint contains no fact allegations about a reorganization of the Department. The plaintiffs' facts govern at this stage, and the defendants are not entitled to offer a competing version in support of a motion to dismiss. It would therefore be premature at this stage to determine whether Weisbruch and the Highway Department are entitled to legislative immunity—resolution of the rival contentions about why the plaintiffs were fired must be left to summary judgment and/or trial following discovery.

Even if Weisbruch was entitled to contradict the facts alleged by the plaintiffs regarding their terminations, moreover, his allegations would still fall short of showing an entitlement to legislative immunity. The defendants assert that prior to Weisbruch taking office, the Highway Department was comprised of four full-time employees, in addition to the Commissioner: a foreman (Wightman) and three general maintenance employees (one of whom was Rowe). Weisbruch decided to restructure the department by adding an in-house mechanic and a construction manager. To achieve this restructuring, Weisbruch either needed to add additional

5

payroll funds to the budget or eliminate two positions. Weisbruch chose the latter route and incidentally eliminated Wightman's and Rowe's positions.

The Court employs a two-part test in determining whether a party is entitled to legislative immunity, first determining whether an action is legislative in form and then evaluating whether it is legislative in substance. *Bagley*, 646 F.3d at 392.[3] An action is deemed legislative in form if it is taken pursuant to constitutional or statutory procedures. *Id; see also Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) (framing the procedural inquiry as whether the actions were "integral steps in the legislative process"); *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 774 (3d Cir. 2000) (defining "procedurally legislative" as "passed by means of established legislative procedures").

Even were the complaint to be supplemented with Weisbruch's allegations concerning a reorganization of the Highway Department, the pleadings would still fail to indicate how Wightman's and Rowe's positions were eliminated. It's true that Weisbruch had the authority as Highway Commissioner to decide the number of employees and distribution of labor within the Highway Department. But this Court cannot determine whether Wightman's and Rowe's terminations were procedurally legislative without knowing the procedure by which Weisbruch eliminated their positions. *See State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 90-91 (2d Cir. 2007) (finding that further discovery was needed to determine whether defendants' acts were procedurally legislative because "the record does not show whether defendants acted pursuant to their statutory budget authority when they ordered the terminations"); *Bagley*, 646 F.3d at 397-98 (distinguishing the facts before it from *Rowland* because the court knew how the Governor's actions led to the elimination of the position at issue, namely his veto

---

[3] While the Seventh Circuit has remarked that examining the action's substance is not explicitly required, it can be useful for determining whether the action operates as a legislative one. *Id.*

of legislation funding the position). The defendants assert only that Weisbruch restructured the Highway Department within the budget constraints and that the two new positions were formalized on May 30, 2017, four days after the plaintiffs were terminated. Whether Weisbruch formally eliminated these roles through an ordinance, a budgetary amendment, or decided only after the plaintiffs were fired to restructure the Highway Department will guide this analysis following discovery.

### B. Fourteenth Amendment Violation

The defendants next argue that even if legislative immunity does not apply, the plaintiffs have failed to plead a Fourteenth Amendment violation as to Weisbruch and the Highway Department. Specifically, the defendants argue that the plaintiffs have failed to state an age discrimination claim and that this theory of liability is duplicative of their First Amendment retaliation theory of liability. In the alternative, the defendants move for a more definite statement as to this count.

The heading of the complaint's equal protection theory nominally indicates that Wightman and Rowe are asserting a claim of age discrimination.[4] The complaint does not address age-related discrimination, however, but rather an equal protection violation based on political affiliation discrimination. The plaintiffs' response brief further confuses the issue—it again refers to the theory of liability as "Plaintiffs' Equal Protection (age) claim." Pl.'s Resp. at 7, ECF No. 20. Yet, it is clear from the pleadings' content that the plaintiffs are alleging political affiliation-based discrimination, not age discrimination. What's more, the defendants have responded to the alleged political affiliation-based discrimination in their briefs. Their response moots the need for a more definite statement, as this count is clearly not "so vague or ambiguous that [defendants] cannot

---

[4] Count II is entitled "Violation of 1983—Equal Protection (Age)." Compl. at 12.

7

reasonably be required to frame a responsive pleading." Fed. R. Civ. Pro. 12(e). The motion for a more definite statement is therefore denied.

Putting the age discrimination confusion aside, the defendants maintain that this count should be dismissed because it is duplicative of the plaintiffs' First Amendment retaliation theory of liability. Such a request misunderstands the distinction between claims and counts. "Claims" establish a grievance and a demand for relief, while "counts" "describe legal theories by which those facts purportedly give rise to liability and damages." *Zurbriggen v. Twin Hill Acquisition Co., Inc.*, 338 F. Supp. 3d 875, 882 (N.D. Ill. 2018). One claim may give rise to multiple theories of liability or "counts." Further, "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). As long as the complaint contains a claim that is viable under some theory of liability, it survives a motion pursuant to Rule 12(b)(6) even if one or more theories it offers in support of the claim are inadequate to the task. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) ("the complaint need not identify a legal theory, and specifying an incorrect theory is not fatal").

There is, moreover, no restriction on the number of legal theories one may advance to support a claim for relief. A plaintiff need not pin his chances on a single legal theory; indeed, plaintiffs are not required to identify any legal theory in the complaint, much less predict which will prove to be the winner. Certainly, pleading multiple theories in support of the same claim does not entitle a plaintiff to multiple recoveries, but a plaintiff may be entitled to recover damages for his injuries under more than one legal theory.

Here, Wightman and Rowe have offered First and Fourteenth Amendment theories of liability to support their claim that Weisbruch, and by extension the Highway Department, retaliated against them for supporting Munson's candidacy. Pleading First Amendment retaliation requires (1) engagement in an activity protected by the First Amendment; (2) a deprivation that would deter future First Amendment activity; and that (3) the First Amendment activity was at least a "motivating factor" in the defendant's retaliatory action. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008). Wightman and Rowe have met the mark here in alleging that Weisbruch fired them in retaliation for publicly supporting his opponent in the 2017 campaign for Highway Commissioner. Because the plaintiffs have plausibly alleged a claim under the First Amendment, it is not appropriate to seek dismissal of the Fourteenth Amendment theory of liability at this stage. Summary judgment is another story—it is the time when the "court can properly narrow the individual factual issues for trial by identifying the material disputes of fact that continue to exist." *BBL, Inc.*, 809 F.3d at 325.

That said, Wightman and Rowe have mischaracterized how the Fourteenth Amendment applies to their retaliation claim. They frame their Fourteenth Amendment theory of liability as political affiliation-based discrimination. A political affiliation-based equal protection claim is "best characterized as a mere rewording of [a] First Amendment-retaliation claim," and therefore is not cognizable under the Fourteenth Amendment. *Vukadinovich v. Bartels*, 853 F.2d 1387, 1391-92 (7th Cir. 1988).

Still, the Supreme Court has maintained that "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments." *Elrod v. Burns*, 427 U.S. 347, 369-70 (1976). In the context of patronage dismissals, the Fourteenth Amendment acts as a safeguard for due process rights. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, 81 (1990) (Stevens,

9

J., concurring) ("[T]he Fourteenth Amendment does not provide job security, as such, to public employees. If, however, a discharge is motivated by . . . constitutionally protected conduct, it is well settled that the State's action is subject to judicial review.") Public employees, like Wightman and Rowe, are therefore entitled to federal judicial review under the Fourteenth Amendment if they are fired for engaging in constitutionally protected activity, like political speech. While the Fourteenth Amendment applies to the state's conduct in such cases, "it is the more specific limiting principles of the First Amendment that finally govern the case." *Elrod*, 427 U.S. at 356 n.10. Consequently, the Fourteenth Amendment applies to Wightman and Rowe's retaliation claim and will not be dismissed as duplicative, for the reasons discussed. It is worth noting, however, that the First Amendment provides the guiding framework for this claim going forward.

## II. Swanson

The plaintiffs seek to hold Swanson liable, in his individual capacity, for encouraging Weisbruch to terminate them under the First and Fourteenth Amendment and tortious interference with prospective economic advantage and employment. The Court considers the First and Fourteenth Amendment violations through both a cat's paw theory of liability and a § 1983 conspiracy framework, before turning to the tortious interference theory of liability.

### A. First and Fourteenth Amendment Violations

#### 1. Cat's paw liability

The plaintiffs allege Swanson is liable for First and Fourteenth Amendment violations under a "cat's paw" theory of liability because Swanson insisted Weisbruch terminate them due to his own discriminatory animus. This framework proves to be an awkward fit for the plaintiffs' claim against Swanson. The cat's paw theory of liability typically takes the following form: a biased subordinate, who lacks decision-making power, "uses a formal decision maker as a dupe in

10

a deliberate scheme to trigger a discriminatory employment action." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014).[5]

The defendants allege that Swanson cannot be held liable under a cat's paw theory because this situation does not present the required elements of a (1) biased supervisor or agent of the decision-maker (2) duping (3) an unbiased decision-maker.[6] The cat's paw theory is traditionally used to impute liability for discrimination to the decision-maker, not to hold the non-decision-maker liable, as Wightman and Rowe seek to do here for Swanson. The Seventh Circuit has held, however, that a subordinate with impermissible animus may be found individually liable for "causing the employer to retaliate against another employee" under § 1983. *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). ("It logically follows that an individual can be liable under § 1981 for retaliatory conduct that would expose her employer to liability").[7] Accordingly, Swanson may be held individually liable for influencing Weisbruch, the decision-maker, to retaliate against the plaintiffs for engaging in protected activity under this theory.

---

[5] This theory is named for the fable in which a clever monkey tricks a cat to retrieve roasting chestnuts from the fire, allowing the cat to burn his paws before the monkey takes off with the chestnuts, unharmed. *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011).

[6] The defendants maintain that a key element in cat's paw liability is missing here because Swanson did not "dupe" Weisbruch into acting. This conclusion conflicts with a recent Seventh Circuit ruling, in which the court warned against taking the metaphor literally. *See Morris v. BNSF Railway Co.*, 969 F.3d 753, 763 (7th Cir. 2020) (finding that "it makes no difference that the evidence [appellant] presented did not align perfectly with a classic cat's paw case," in that the non-decision-maker did not trick the decision-maker into acting).

[7] Though *Smith* involved a § 1981 claim, the Seventh Circuit noted that "the same standards govern intentional discrimination claims under Title VII, § 1981, and § 1983." 681 F.3d at 899.

11

Courts have reached differing conclusions when it comes to whether a defendant can be held liable as a cat's paw if he is not a subordinate of the final decision-maker.[8] But this Court need not tread into those waters because another point proves dispositive, namely whether Swanson acted under color of law in urging Weisbruch to terminate Wightman and Rowe. That a state employee must have acted under color of law in depriving an individual of his constitutional rights is a basic premise of individual liability under § 1983. *See* 42 U.S.C.A. § 1983 (2018); *West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff . . . must show that the alleged deprivation was committed by a person acting under color of state law.") Notably, "[n]ot every action by a state official or employee is to be deemed as occurring under color of state law" and the "mere assertion that one is a state officer does not necessarily mean that one acts under color of state law." *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010). A public employee's actions are considered under color of state law if "they are related in some way to the performance of the duties of the state office." *Honaker v. Smith*, 256 F.3d 477, 485 (7th Cir. 2001).

Here, Swanson was not acting under color of state law when he pushed Weisbruch to terminate Wightman and Rowe. As Township Supervisor, Swanson did not have any authority over highway maintenance employees, including the power to terminate them. Indeed, in the plaintiffs' account, Swanson's lack of authority over the Highway Department is what propelled the parties here in the first place, as Swanson sought out a Highway Commissioner who was more

---

[8] *Compare Greene v. Cook County Sherriff's Office*, 79 F. Supp. 3d 790, 812 (N.D. Ill. 2015) (applying cat's paw theory, while recognizing that it "may not be a perfect fit," where non-decision-maker was not a subordinate of decision-maker) *and DeNoma v. Hamilton County Court of Common Pleas*, 626 Fed. Appx. 101, 105 (6th Cir. 2015) (applying cat's paw theory though acknowledging it was "nontraditional" as the defendant was the superior of the unbiased decision-making committee), *with Barbera v. Pearson Edu., Inc.*, No. 1:16-cv-2533-JMS-DML, 2017 WL 6616586, at *11 (S.D. Ind. Dec. 28, 2017) (declining to apply cat's paw theory where biased individual was not decision-maker's subordinate), *and Baxter v. Carite Corporate, LLC*, No. 1:18-cv-01725-JRS-DML, 2020 WL 5204086, at *6 (S.D. Ind. Aug. 31, 2020) (same).

closely aligned with his vision for the Department. The complaint provides no support for the inference that recommending the termination of highway maintenance employees was "related in some way" to Swanson's duties as Township Supervisor.

In that sense, this case is distinguishable from *Greene*, which Wightman and Rowe rely on heavily in shaping their cat's paw liability argument. There, the plaintiffs alleged the Cook County Board President had indirectly moved for the Sheriff's Office to fire them—members of her security detail—because they had previously worked for her opponent. 79 F. Supp. at 793-94. The Cook County Board President and Sheriff's Office held "divided authority" over the security detail because detail members reported to supervisors in both offices. *Id.* at 795, 819. Consequently, the court found that cat's paw liability might apply because there was "divided authority over the final employment decision." *Id.* at 812. Put differently, both the Cook County President and the Sheriff's Office were acting under color of law because employment decisions on the security detail were related to their duties. Not so for Swanson; there is no basis in the complaint to infer that Swanson had any authority at all over the Highway Department. Because Swanson cannot be said to have acted under color of law in making his recommendation to fire Wightman and Rowe, the cat's paw theory of liability does not apply here.[9]

### 2. § 1983 Conspiracy

Rather than shoehorning the plaintiffs' claim against Swanson into a cat's paw theory of liability, this claim fits more easily into a § 1983 conspiracy framework. Though the plaintiffs do not allege a civil conspiracy claim under § 1983 in their complaint, as noted, the failure to identify

---

[9] The plaintiffs also allege a cat's paw liability theory of liability against Weisbruch and the Highway Department, as an alternative to direct retaliation. Compl. ¶ 83. This application is not cognizable because without a "cat's paw" (Swanson in this case), there can be no cat's paw liability.

13

a specific legal theory in a complaint does not proscribe its application; "it is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker v. Milwaukee Cty., Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014).

To plead civil conspiracy under § 1983, a plaintiff must allege facts that permit a reasonable inference of "(1) an express or implied agreement among defendants to deprive plaintiffs of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Wheeler v. Piazza*, 364 F. Supp. 870, 880 (N.D. Ill. 2019) (quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). Further, a plausible conspiracy claim must include the parties involved, the conspiracy's general purpose, and its approximate date. *Dobbey v. Jeffreys*, 417 F. Supp. 3d 1103, 1110 (N.D. Ill. 2019). Unlike a typical § 1983 claim, conspiracy does not require that only state employees, acting under the color of law, be involved. Instead, private citizens can be roped in as long as there was sufficient state involvement in the constitutional deprivation. *Cunningham v. Southlake Center for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991) ("When a private actor is implicated, the section 1983 plaintiff may nevertheless prevail if he shows sufficient state involvement in the action to trigger constitutional protections.").

The plaintiffs allege that Swanson and Weisbruch had an express or implied agreement to punish them for exercising their First Amendment rights in supporting James Munson for Highway Commissioner. Swanson and Weisbruch allegedly agreed to a *quid pro quo*, in which Swanson would provide Weisbruch with political and financial support in exchange for his commitment to fire Wightman and Rowe upon taking office. These allegations identify the parties involved in the conspiracy (Swanson and Weisbruch) and its general purpose (getting Wightman and Rowe fired). The plaintiffs also provide a general time frame, alleging that Swanson first recruited Weisbruch

14

for the position in 2016 and provided him with campaign resources up until the April 2017 election. Again, though Swanson is a public official, he was not conducting himself as a state actor in forming this agreement, as discussed above. By contrast, Weisbruch consented to the plan, under the presumption that he could only execute it if he was elected Highway Commissioner, clothed with the authority of the state. The conspiracy thus involved a state actor, Weisbruch, and a non-state actor, Swanson. Viewed as a whole, these allegations plausibly allege civil conspiracy under § 1983.

### B. Tortious Interference with Prospective Economic Advantage

The plaintiffs also assert two tort theories of liability against Swanson: tortious interference with employment and tortious interference with prospective economic advantage. Under Illinois law, tortious interference with employment is considered a form of tortious interference with prospective economic advantage, the advantage being continued employment. *Urbina v. Village of Fox Lake*, No. 13 CV 8851, 2015 WL 74088, at *7 (N.D. Ill. Jan. 5, 2015). These two counts are therefore substantively indistinguishable.

The defendants argue that the plaintiffs' tort theories are time-barred under the Tort Immunity Act, which mandates that tort claims be brought against a public official within one year of the injury. 745 ILCS 10/8-101(a). Crucial to this analysis, the public official must have been acting within the scope of his employment at the time of the violation for the one-year statute of limitations to apply. *Fonseca-Bradford v. DuPage County Election Commission*, No. 19-cv-1474, 2020 WL 4437801, at *2 (N.D. Ill. Aug. 3, 2020) ("For the [Tort Immunity Act] to apply to public employees, the alleged actions must have been taken within the scope of their employment."); *Thomas v. Walden*, 2020 IL App (3d) 190573-U, ¶ 21 ("Of course, the limitations period of section 8-101(a) of the Act does not apply when the employee is engaged in conduct that takes the

15

individual outside the scope of their employment.") Wightman and Rowe were terminated on May 26, 2017 and filed suit on April 6, 2019, almost two years after the injury.

The plaintiffs are not obligated to address the statute of limitations as it is an affirmative defense, but they have chosen to challenge it on the merits. They argue that their tort theory of liability is subject to the standard five-year statute of limitations, under 735 ILCS 5/13-205, because Swanson was not acting within his scope of employment when he pushed for their termination.

A public employee's actions fall outside the scope of employment if they are "different from the type of acts he is authorized to perform or were performed purely in his own interest." *Wright v. City of Danville*, 174 Ill. 2d 391, 406, 675 N.E.2d 110, 118 (1996). The defendants argue that workforce determinations are within the scope of employment of public officials, like Swanson, and draw on several cases for support. *See Brooks v. Daley*, 2015 Ill. App. (1st) 140392 (2015), ¶¶ 18, 30, 29 N.E.3d 1108, 1114, 1116-17 (mayor and chief of staff were within scope of employment in forcing plaintiff's resignation because they "serve in positions involving the determination of policy and exercise of discretion," which encompasses hiring and firing of high-ranking city officials); *Kevin's Towing, Inc. v. Thomas*, 351 Ill. App. 3d 540, 549, 814 N.E.2d 1003, 1011 (2004) (mayor's decision to revoke towing contract with plaintiff was a policy decision and entitled to immunity, even if undertaken out of "corrupt or malicious motives").

While public officials enjoy a wide berth regarding what acts are covered by scope of employment, it is not absolute. One such outlier is sexual harassment, which courts have repeatedly found to be beyond the scope of an official's employment. *See Dorsey v. Givens*, 209 F. Supp. 2d 850, 852 (N.D. Ill. 2001) ("such conduct is solely for the personal benefit of the transgressor"). In *Wright*, the court found that city commissioners were not acting within the scope of employment

16

in negotiating a settlement to advance their personal interests because they were actions "obviously different from those they were authorized to perform." 174 Ill.2d at 406, 675 N.E.2d at 118.

Similarly, there is no evidence to support that Swanson's involvement in the hiring and firing of Highway Department workers was within the scope of his employment. To the contrary, the Illinois Highway Code provides that the Highway Commissioner has sole authority to employ labor for the Highway Department. As Township Supervisor, Swanson therefore had no authority to hire, fire, or direct Highway Department staff. A fair reading of the complaint supports the inference that Swanson was acting solely out of personal interest, and potentially a desire for retribution, in arranging a *quid pro quo* with Weisbruch to fire Wightman and Rowe. His actions cannot be deemed to have taken place within the scope of his employment as Township Supervisor. Consequently, the Tort Immunity Act's one-year statute of limitations does not apply. As the plaintiffs' claim falls within the standard five-year statute of limitations, their tortious interference theory of liability may proceed.

*    *    *    *    *

For the reasons discussed, the defendants' motion to dismiss is denied.

Date: February 12, 2021

John J. Tharp, Jr.
United States District Judge